IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 2:14cr163 |
| | ) | |
| MOSTAFA AHMED AWWAD, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

SENTENCING POSITION OF THE UNITED STATES

The United States of America, through its attorneys, Dana J. Boente, United States Attorney, Benjamin L. Hatch and Joseph E. DePadilla, Assistant United States Attorneys, and Heather M. Schmidt, Senior Trial Attorney, National Security Division, hereby submits its position with respect to the defendant's sentencing factors. There are no unresolved objections by either party to the Presentence Investigation Report ("PSR"). The PSR calculates the advisory sentencing guideline range at 151 to 188 months, based on a total offense level of 34 and a Criminal History Category of I. As the Court knows, the parties entered into, and the Court has accepted, a Rule 11(c)(1)(C) plea agreement that provides for a sentencing range of 8 to 11 years (or 96 to 132 months). For the reasons described below, the government respectfully recommends that the Court sentence the defendant to a sentence of 132 months (11 years).

**I.     Background**

The defendant was originally charged on December 3, 2014, in a two-count indictment alleging violations of 22 U.S.C. §§ 2778(b)(2) and (c) (and related regulations). On June 15, 2015, the defendant pled guilty to a criminal information charging attempted espionage, in

violation of 18 U.S.C. § 794(a).

## II.     Position on Sentencing and Argument

"[I]n imposing a sentence after *Booker*, the district court must engage in a multi-step process. First, the court must correctly determine, after making appropriate findings of fact, the applicable guideline range." *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006). "Next, the court must 'determine whether a sentence within that range serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors.'" *Id.* (quoting *United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006)). In making this determination,

> a sentencing court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant" and the need "to reflect the seriousness of the offense," provide "just punishment," "afford adequate deterrence," "protect the public," and "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

*United States v. Hampton*, 441 F.3d 284, 287 (4th Cir. 2006) (quoting 18 U.S.C. § 3553(a)).

### A.     Nature and Circumstances of the Offense

#### 1.     The Offense

The nature and circumstances of the offense weigh heavily against the defendant. As the PSR and the Statement of Facts in this case detail, over the course of several months in the fall of 2014, the defendant attempted to provide the Egyptian government with the schematic designs for the USS Ford, the first in a class of new and advanced aircraft carriers being built for the United States Navy.[1] The defendant's stated goal in providing this information to Egypt

---

[1] The USS Ford cost the Navy approximately $12.9 billion to design and build. The USS Ford

was either to enable Egypt to construct a carrier if it wished by copying the Ford's designs, or to enable Egypt to identify and exploit relative weaknesses in the Ford's design in order to sink it. The defendant indeed purported to point out locations on the Ford where he felt a strike could cause maximum damage:

> Awwad: Yes. And, and there is cool stuff you're gonna see so . . . inside there . . . inside the drawings when I get the full drawings . . . and this is the most thing I like, we'll be able to see . . . even if we are not able to make the carrier . . . even if we are not able to because it's very expensive . . . At the very least you'll be able to see how the carrier can be hit and drowned.
>
> UC: Hit and sunk?
>
> Awwad: yes, because you want to know the bomb base areas.
>
> UC: Yes, we will know . . .
>
> Awwad: So if you want to hit the places with a bomb, the bomb storage area, that's it    . . . "bye bye"[2]

And, at another point in the conversation:

> Awwad: And you will also know which point on the flat . . .they call it a deck . . . the point that is the weak point from the CAD drawings.
>
>    . . . [omitting some discussion]

---

concept was introduced in the early 1990s and research and development began in the late 1990s. The Navy has plans to build 11 carriers of this class five years apart until complete. Each is expected to remain in service for at least 50 years.

[2] The above quotation of a transcribed conversation, and others in this position, come from the transcriptions of respective meetings between Awwad and an FBI Undercover (UC). The government can provide the transcripts to the Court if the Court would like to review them. In the underlying transcripts, the conversation often switches between English and Arabic (with Arabic reflected as italicized text). Because the underlying language used did not seem pertinent here, the government has not differentiated between conversation that occurred in English and conversation that reflects a translation from Arabic.

>    Awwad: Yes. So, the missile has to penetrate the deck, because the deck is a floating device. You know the part where the planes take off from? It's a floating device even if all of this part is underwater, and it's full . . .
>
>    UC: It will still float.
>
>    Awwad: That will let it float.
>
>    UC: So this will give us an idea . . .
>
>    Awwad: If you broke the floater like this, which is the deck, then it's over . . .

When completed, roughly 4,000 Navy sailors will be assigned to the Ford. The defendant's acts of attempted espionage therefore envisioned putting the lives of thousands of Navy sailors at risk, by compromising the designs, technology and security of a significant element of the national defense, the USS Ford.

These acts are bad enough, but the defendant's criminal conduct went further still. The defendant sought a job with the U.S. Navy, and, after obtaining that job, he sought a security clearance. As part of the security clearance process, the defendant was required to renounce his Egyptian citizenship. As the defendant explained to the FBI Undercover agent (hereinafter, the "UC"), however, what the defendant instead did was to seek a way to retain his Egyptian citizenship secretly, while appearing to renounce it so that he could gain the clearance. The defendant told the UC that he went to the Egyptian embassy and presented this desire to a person there. That person raised the prospect that the defendant could move nuclear technology to Egypt, to which, the defendant stated he responded "Allah willing. May Allah make this possible!" The defendant explained to the UC on his first meeting in September of 2014 – to which meeting, the government notes, the defendant brought a firearm – that his goal was to

4

move technology to Egypt:

>Awwad: My ultimate goal is to move everything I know . . .
>
>UC: To move everything you know here . . .
>
>Awwad: To Egypt.
>
>UC: To Egypt.   How?
>
>Awwad: The tradecraft.

And, later in the conversation:

>Awwad: I am going to get out the stuff the stuff I am able to get out. At the time, I see that is fit.
>
>Awwad: I'm not going to take any pressure from anybody at home, because . . .
>
>UC: Yeah.
>
>Awwad: Eventually, I'm gonna get it back.   Eventually with my mission, in life is to take that stuff, put it, move it to home, and make it work.   And it would help a lot if we can like, when I go to Egypt and I meet with specialist people.

The defendant also offered that he would be willing to attach tracking devices to U.S. submarines in the shipyards so that they could be tracked when they returned to sea.   He would accomplish this by virtue of his access to submarines at the shipyard, where he worked.   All he asked was that the UC provide him with a "beacon device," and he claimed that over the course of three years "you can have a bug in every single submarine."

Moreover, as the defendant's last meeting with the UC on December 5, 2014 demonstrates, the defendant was committed to providing information well in excess of the Ford schematics.   The defendant stated he wanted to meet with high ranking Egyptian intelligence and military officials in Cairo.   The goal of this meeting, according to the defendant, would be

5

for them to instruct him on the specific types of information they wanted him to collect.  *See* PSR p.9 (Awwad: "I need to know exactly what they are looking for exactly, so I can focus on that and produce a lot for that thing.").   In short, the defendant's conduct demonstrates that it was his intent all along to move U.S. technology and information to Egypt, and that he was prepared to move as much as possible to benefit the country he considered to be his true home – Egypt.

The defendant's acts in this case constitute a betrayal of the United States.   The defendant moved to the United States and became a naturalized citizen by virtue of marriage. He achieved the benefit of a good education, and secured a good job with the Navy.   The defendant was given many opportunities by this country, and he repaid those opportunities with deceit and betrayal.   The defendant was not content to take the benefit of the education and job skills he had learned in this country back to Egypt.   Rather, he desired to steal this country's sensitive information, including national defense information, and to give that information to Egypt to benefit Egypt and himself.   The defendant even saw fit to express contempt for the United States for its willingness to employ someone from his background:

> Awwad: I'm telling you, I don't know what's wrong with this Government, they're hire Chinese, they hire Russian, they hire us . . .
>
> UC: Yeah.
>
> Awwad: I don't know . . .
>
> UC: Damn, well . . as long as they keep, let them be stupid, you know?
>
> Awwad: That's good . . .
>
> UC: That's good for us. [laughs]

  Awwad: And that's . . . that's what I'm doing.

Throughout his interactions with the UC, the defendant demonstrated his knowledge that his conduct was illegal and that he would go to jail if caught.  At one point he stated he would go to prison for the rest of his life if apprehended based on the nature of his security clearance (he claimed it was Top Secret, which is actually false).  In their second meeting, the defendant actually chided the UC on his tradecraft, claiming that their email communication system was insufficiently secure.  The defendant proceeded to describe an elaborate means of communicating by one-time phony email accounts in order to avoid FBI detection.  The defendant requested an escape plan, and he supplied two passport photographs of himself at the dead drop site so that they could be used to create an Egyptian passport in another name.

The defendant may try to claim that this crime was a single mistake, inconsistent with his otherwise law-abiding life.  That claim is belied by the evidence.  First, as noted above, the defendant indicated his general goal was to move information to Egypt.  The defendant even told the UC that he had begun stealing files from the Navy *prior to* meeting the UC:

  Awwad: It takes some time, because, for these four files, I had to download all these files.

    . . . [omitting some discussion]

  UC: How long did that take you?

  Awwad: Uhhh . . . like almost a month and a half . . .

  UC: What!?

  Awwad: Yes.

  UC: A month and a half, so you've been hacking files for a month and a half?!

    Awwad:    Yes . . . since before I met you

The defendant also told the UC that his reason for taking a job with the Navy was to steal information, and that he passed up a higher paying opportunity at Lockheed Martin so that he could get the information only the Navy possessed:

    UC:    So from day one when you started, you like, you started doing it, were you cautious about it?

    Awwad:    Oh yeah . . .   I went to this place, just for this reason.   This was my vision . . . I wanted to do something for the country, you know?   I had the ability . . . I had Lockheed Martin . . .

    UC:    You had Lockheed Martin as an opportunity?

    Awwad:    As an opportunity, for ninety five thousand dollars.

    UC:    You turned it down.

    Awwad:    And I turned it down for sixty, for fifty four.

    UC:    Oh, I'd be pissed.

    Awwad:    Because . . . we wouldn't have been able to get these things. You know?   My wife went mad and said "What are you're doing?   You don't know what you're doing?"   I told her don't worry about that, I got that s**t. . you know. . .

As the PSR and the Statement of Facts detail, the information which the defendant attempted to provide to the Egyptians was national security information.   It contained the valuable work product of the Navy and the shipbuilder regarding ship design, and it could enable another country that possessed hostile intent (not to suggest that Egypt does) to identify areas of relative weakness on the Ford or other carriers in that class to be built in the future.   The Navy and the shipbuilder took steps to protect this information, which included warnings markings and handling restrictions.   Indeed, the defendant demonstrated that he understood the "NOFORN"

handling restriction to mean the information was sensitive. As the defendant stated to the UC: "So, NOFORN means it's not . . it's like ahhh . . . how you say ..? It's like Secret stuff . . . You cannot get it outside or cannot e-mail it, that's for us not to e-mail it to each other."

## 2. Consideration of the Advisory Sentencing Guideline Range

The Court will consider the advisory sentencing guideline range in its analysis of the Section 3553(a) sentencing factors. In this case, the advisory sentencing guideline range is 151 to 188 months, which the government submits counsels in favor of a sentence at the higher end of the sentencing range set forth in the plea agreement in this case.

The government will address, however, why it believes a sentence of 11 years, which is below the advisory sentencing guideline range, is appropriate in this case. Section 2M3.1 of the guidelines, which is the relevant guideline for this case, provides only two offense levels. It provides for an offense level of 42 if Top Secret information was gathered or transmitted, and it provides for an offense level of 37 "otherwise." "Otherwise" is certainly an inclusive category that would, on its face, apply to the type of information the defendant provided in this case. But, to the best of the government's research, it appears to the government that the types of cases falling in the level 37 category historically have involved classified national defense information. Although the information the defendant provided here was information relating to the national defense and was protected by the U.S. government in the various ways described in the PSR and Statement of Facts, the information was not classified. Because the national defense information was not classified, the government believes a sentence at a range lower than that provided for by the guidelines is appropriate.

However, within the lower sentencing range set forth in the plea agreement, the

government recommends a sentence at the high end, which would be 11 years. The high end of this sentencing range is appropriate because of the potential loss of thousands of U.S. service members' lives, almost two decades of research and development, and billions in U.S. tax payer money that might have resulted if the defendant had succeeded in his scheme to pass the schematics of the USS Ford. In sum, the defendant's actions would have significantly damaged the national defense of the United States if they had succeeded as he hoped.

### B. History and Characteristics of the Defendant

The defendant's lack of criminal record certainly weighs in his favor, and is a factor the government took into account in agreeing to a sentencing range below the advisory guideline range.

The defendant has submitted, in connection with sentencing, various letters from friends and family members. These letters generally attest to the defendant's character as observed by these friends and family. It is worth noting in this regard, however, that the defendant made a point of telling the UC that he trusted no one and that no one really knew him:

> Awwad: This is not against you and this is nothing against me. We're in that field, so you cannot trust anybody.
>
> UC: It's just the nature of our business.
>
> Awwad: Exactly correct. If I had trusted someone, my wife would be the first one to know. Right? But it's an impossibility and now she knows nothing even till the day I die.
>
> UC: Yeah, that's the way it should be. You have to keep everything confidential.
>
> Awwad: Exactly.
>
> UC: Confidential.

10

>   Awwad:   I don't have friends.   I don't have anyone that knows anything about me.   You understand me?   Just for that particular purpose.

At another point in his meeting with the UC, the defendant discussed how he needed an apartment to facilitate his scheme because he could ship items from it.   The defendant indicated that he would rent the apartment in his friend's name, presumably to avoid having shipped items traced to him, and that he would not tell the friend what he was doing.   The defendant added:

>   Awwad:   Remember when I told you that you can be friends with a lot of people and be very best friends with them and then use them. . .
>
>   UC:   Yeah . . .
>
>   Awwad:   Without telling them anything.

The defendant even went so far as to denigrate his wife and father-in-law because they had become committed to America:

>   Awwad:   I told you always that [his wife] knows nothing.   [His wife] has not struggled and is living here.   It's hard to say that, but they don't have loyalty.   Her father . . . at first he said to me . . . . I loved this man . . . When I returned from Egypt, we sat down and talked.   I asked him if he was an Egyptian in the middle of our conversation and he said, "No, I'm not an Egyptian."   He frustrated me so much that I was going to cry. I told him "No you are Egyptian, and from the Helwan as well."   I really wanted to tell him "You suck!"   [laughs] What's this "I'm not Egyptian?"   What kind of trashy people are these?

####   C.   <u>Avoiding Unwarranted Disparities</u>

While there are no co-defendants in this case, the government believes that the goal of avoiding unwarranted disparities deserves mention.   As noted above, the advisory guideline range exceeds the sentencing range agreed upon by the parties in the plea.   The government has

already addressed why it believes a lower range is appropriate. But, within that lower range, a sentence at the high end would best serve the goal of avoiding unwarranted disparities. Other defendants who provided or sought to provide national defense information are usually at offense level 37. Although the information in this case was not classified at the Secret or Confidential levels, which is also included within offense level 37, the information was nonetheless sensitive national security information. A sentence of 11 years would take into account the nature of the information in the case, while avoiding a large, and in the government's view, unwarranted, disparity with other defendants falling in the offense level 37 category.

### D. Need for Deterrence

The government submits that considerations of specific and general deterrence weigh in favor of a sentence of 11 years. Espionage, or attempted espionage, is one of the most serious offenses in the United States Code. That seriousness should be reinforced through sentencing. The defendant's statements to the UC indicate that it was his goal to steal technology and secrets from our country and send them abroad. His statements indicate his contempt for the United States and his abiding commitment to Egypt. He needs to be personally deterred from engaging in such conduct in the future. More generally, the sentence in this case should be sufficient to deter others who seek to exploit positions of trust within the U.S. government for the benefit of another country and/or to harm the United States.

### III. Conclusion

Taking all the Section 3553(a) factors into account, the government respectfully submits that a sentence of 11 years is appropriate.

Respectfully submitted,

Dana J. Boente
United States Attorney

By:       /s/
Benjamin L. Hatch
Joseph E. DePadilla
Assistant United States Attorneys
Attorney for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, VA 23510
Office Number: 757-441-6331
Facsimile Number: 757-441-6689
E-Mail Address: Benjamin.Hatch@usdoj.gov


By:       /s/
Heather Schmidt
Senior Trial Attorney
Counterintelligence and Export Control Section
National Security Division
Department of Justice
600 E Street N.W.
Washington, D.C. 20004
Office Number: 202-233-2132
Facsimile Number: 202-233-2146
E-Mail Address: Heather.Schmidt@usdoj.gov

<u>Certificate of Service</u>

I hereby certify that on the 8th day of October, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification to the following:

    James O. Broccoletti, Esq.
    Zoby, Broccoletti & Normile, PC
    6663 Stoney Point South
    Norfolk, Virginia 23502

                                      /s/
                                Benjamin L. Hatch
                                Assistant United States Attorney
                                Attorney for the United States
                                United States Attorney's Office
                                101 West Main Street, Suite 8000
                                Norfolk, VA 23510
                                Office Number: 757-441-6331
                                Facsimile Number: 757-441-6689
                                E-Mail Address: Benjamin.Hatch@usdoj.gov